UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:
BRYAN A. LAMEY,

No. 14-13729 ta7

Debtor.

EDWARD ALEXANDER MAZEL,
Chapter 7 Trustee of the bankruptcy estate of
BRYAN A. LAMEY; and UNITED REAL
ESTATE LAS CRUCES, LLC.,

Plaintiffs,

v.

Adv. No. 18-01057-t

LAS CRUCES ABSTRACT AND TITLE
COMPANY, FIDELITY NATIONAL
TITLE INSURANCE COMPANY, and
TCNM, LLC.,

Defendants.

## **OPINION**

Before the Court is Defendant TCNM, LLC's motion for summary judgment that it is not the successor of Las Cruces Abstract and Title Company, and therefore is not liable for any of that entity's debts. The motion has been fully briefed and argued. The Court concludes that there are no genuine issues of material fact and that Plaintiffs' successor liability claims fail as a matter of law. The motion therefore will be granted.

I. FACTS

There is no genuine dispute about the following facts:

In 2014, Carl Hunter, who had been working in the title company business for about thirty years, was approached by Bill Shattuck, a business broker, with an opportunity to purchase the

assets of three title company businesses— Defendant Las Cruces Abstract & Title Co., Inc.; Luna County Abstract & Title Co., LLC; and Hidalgo Abstract Company, Inc. The three companies are owned by Gregg Floyd, Guy Floyd, and Elvia Romero. Hunter or his assigns made an offer to buy the subject assets on December 18, 2014. The parties negotiated for the next several months. The transaction closed on May 22, 2015.

To buy the assets, Mr. Hunter organized two limited liability companies in May 2015: movant TCNM, LLC, and DAHL, LLC. At closing TCNM bought LCAT's tangible and intangible personal property, including furniture, fixtures, equipment, title plant, work in process, trade name, website, and telephone number. DAHL purchased LCAT's real estate, which it leased to TCNM.

Mr. Hunter is the managing member of TCNM; Brad Foreman also is a member. Neither has ever been a shareholder, officer, or director of LCAT. Between February 1984 and February 2004, LCAT employed Mr. Hunter as a title examiner and paid him an hourly wage. Further, between March 2015 and May 22, 2015, Mr. Hunter worked as an independent contractor for LCAT while awaiting the state license transfer so TCNM could operate as a title agency.

The total purchase price for the assets of all three entities was $2.18 million. A portion of that purchase price was allocated to LCAT's assets:

| | |
|---|---|
| Las Cruces Real Estate | $ 523,000 |
| Las Cruces FF&E | $ 20,000 |
| Las Cruces Title Plant and Goodwill | $ 930,000 |
| Las Cruces Covenant not to Compete | $ 15,000 |
| Total: | $1,488,000 |

The purchase agreement provides in part:

> At closing, Seller shall retain all Accounts Receivable, and agrees to pay all Accounts Payable and other debts or encumbrances against the above Business.
>
> . . .

-2-
Case 18-01057-t    Doc 152    Filed 02/28/20    Entered 02/28/20 15:30:22 Page 2 of 9

> Purchaser understands and agrees that any uncovered losses on the title polices done under prior ownership period are the liability of the respective underwriter or their assigns. Sellers agree to hold Purchaser harmless from any liability of their prior actions.

After TCNM and DAHL bought LCAT's assets and began operations, TCNM hired several of LCAT's former employees, including Elvia Romero, who was hired as an escrow officer.[1] None of the former LCAT employees became owners, members, managers, or officers of TCNM.

This adversary proceeding relates to an owner's title insurance policy issued by Fidelity National Title Insurance Company on or about September 7, 2012, and the related real estate purchase and purchase money loan. LCAT served as title insurance and escrow agent for the transaction. Plaintiffs have asserted claims against LCAT arising from its work on the title policy and/or closing the transaction. Although the transaction closed nearly three years before TCNM bought LCAT's assets, Plaintiffs allege that TCNM is liable for any debts LCAT may owe Plaintiffs.[2]

---

[1] Escrow officers are not "officers" akin to a President, Vice President, Secretary, etc. Even though Ms. Romero was an escrow "officer" she had no supervisory or managerial authority at TCNM. Before her job was terminated at TCNM, she was one of five escrow officers.

[2] The Court will make detailed findings of undisputed facts about this transaction in connection with other rulings on pending summary judgment motions. For the purpose of TCNM's motion, the following findings of undisputed facts are sufficient: On or about August 30, 2012, United Real Estate-Las Cruces, LLC ("URELC") and others borrowed $1.65 million from Los Alamos National Bank (the "Bank") to fund URELC's purchase of real property at 700 Stern Drive, Las Cruces, New Mexico (the "Property"). The seller was Next Level, LLC, an entity owned by Robert Maese Sr. and Robert Maese Jr. The loan, which Debtor and the Maeses personally guaranteed, was to be secured by a first mortgage on the Property. Before the purchase, the Property was encumbered by three mortgages, including a mortgage to KZRV, L.P (the "KZRV mortgage").The Bank, URELC, and Next Level engaged LCAT to provide owner's and mortgagee's title policies for the Property and to act as the closing agent for the loan and the purchase. LCAT, a title insurance agent for Fidelity National Title Insurance Company, issued a title commitment effective August 30, 2012, committing Fidelity to insure title subject to satisfaction of the listed requirements, among which was the release of the KZRV mortgage. The transaction funded and closed on September 6, 2012. The loan proceeds were used to pay off two of the mortgages encumbering the Property. The KZRV mortgage was not paid off at closing and was not released. Instead, LCAT's agent, Elvia Romero, relied on the representations of Robert Maese Sr. that he would obtain a release of the KZRV mortgage shortly after closing. The day after closing LCAT issued an owner's title policy to URELC and a mortgagee title policy to the Bank. Both policies insured over the KZRV mortgage. It was never released. URELC made a claim on its owner's policy on July 28, 2015. Plaintiffs brought a number of claims against

## II. DISCUSSION

### A. Summary Judgment Standards.

Summary judgment is appropriate where "there is no genuine dispute as to any material fact," thereby entitling the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A dispute is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material when it "might affect the outcome of the suit under the governing substantive law." *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986)). In ruling on a motion for summary judgment, the Court is required to "view the facts and draw reasonable inferences in the light most favorable to the party opposing the . . . motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### B. Successor Liability

In New Mexico as elsewhere, the general rule is that buying a business's assets does not make the buyer liable for the seller's debts.[3] *See, e.g., Pankey v. Hot Springs Nat. Bank*, 119 P.2d 636, 640 (N.M. 1941). "[A] cash sale of assets is insufficient to impose responsibility on a successor corporation for the debts and liabilities of its predecessor." *Garcia v. Coe Mfg. Co.*, 123 N.M. 34, 37 (S. Ct. 1997). Underlying this rule is the public policy of facilitating the "free alienability of corporate assets" to promote economic development. *Id.*

There are four exceptions to the general rule against successor liability:

> (1) Where the purchaser expressly or impliedly agrees to assume such debts; (2) where the transaction amounts to a consolidation or merger of the corporations; (3) where the purchasing corporation is merely a continuation of the selling corporation; and (4) where the transaction is entered into fraudulently in order to escape liability for such debts.

---

Fidelity and LCAT in this adversary proceeding, all based on LCAT's failure to insist that the KZRV mortgage be released before closing the transaction.

[3] The rule is often couched in terms of one corporation buying the assets of another corporation, but the rule applies with equal force to limited liability companies, partnerships, joint ventures, business trusts, and individuals.

-4-
Case 18-01057-t    Doc 152    Filed 02/28/20    Entered 02/28/20 15:30:22 Page 4 of 9

*Garcia*, 123 N.M. at 38; *Southwest Distributing Co. v. Olympic Brewing Co.*, 90 N.M. 502, 505 (S. Ct. 1977).

In response to TCNM's motion for summary judgment, Plaintiffs argue that there are genuine issues of fact about whether the first, third and/or fourth exceptions apply to TCNM's acquisition of LCAT's assets.

1. <u>TCNM did not agree to assume liability for LCAT's debt to Plaintiffs (if any)</u>. During oral argument Plaintiffs asserted for the first time that there are genuine issue of fact whether TCNM agreed to assume liability for any amounts LCAT might owe Plaintiffs. The argument is based entirely on the following provision in the agreement:

> Sellers agree all Open Title Commitments will transfer to Purchaser the day of closing with no proration's being done.

Pointing to that provision, Plaintiffs argue that the title commitment involving URELC's purchase of the Property is still "open" because one of its stated requirements (i.e. that the KZRV mortgage be released) had not been satisfied by the May 22, 2015 closing. This weak argument must be overruled. The title policy contains the following:

> 15. **LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT**
> (a) This policy together with all endorsements, if any, attached to it by the Company is the entire policy and contract between the Insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

Under this provision, the title policy superseded the title commitment. *See, e.g., Shamrock Bank of Florida v. First American Title Ins. Co.*, 2014 WL 1304694, at *10 (S.D. Ill.) (in light of the integration clause, parties intended the title policy to supersede the title commitment); *Archambo v. Lawyers Title Ins. Corp.,* 646 N.W.2d 170, 176–77 (Mich. 2002) (title policy superseded title commitment due to integration clause of title policy; thus, requirements of the title commitment

were nullified); *see generally Cont'l Mobile Tel. Co., Inc. v. Chicago SMSA Ltd. P'ship,* 587 N.E.2d 1169, 1173 (Ill. App. 1992) (integration clause supersedes all prior discussion and agreements).

By issuing the title policy Fidelity superseded the title commitment, nullifying or waiving any unfulfilled requirements. The title commitment was not "open" after September 7, 2012. By the time TCNM bought LCAT's assets, the title commitment had been "closed" for nearly three years. No genuine issue of fact exists whether TCNM agreed to assume LCAT's liability to Plaintiffs.

    2.    <u>TCNM is not a mere continuation of LCAT</u>

The third exception—mere continuation—exists when there is "(1) a continuity of directors, officers, and shareholders; (2) continued existence of only one corporation after sale of the assets; and (3) inadequate consideration for the sale of the assets." *Garcia*, 123 N.M. at 38, citing *McCarthy v. Litton Indus.*, 410 Mass. 15, 23 (1991). While the *Garcia* Court's use of "and" instead of "or" suggests that each of these three elements must be proven to win a "mere continuation" argument, here the undisputed evidence shows that *none* of the elements are satisfied.

First, while Plaintiffs assert there is a genuine dispute whether there was continuity of directors, officers, and shareholders, no such dispute exists. Plaintiffs assert that Eliva Romero "maintained her position as president after the purchase." There is no evidence to support the assertion. Rather, the record unequivocally shows that TCNM employed Ms. Romero for some period of time as an escrow officer, but that she was never a manager, officer, supervisor, or member of TCNM. Aside from their unsupported assertion regarding Eliva Romero, Plaintiffs present no evidence or argument of a continuity of management or ownership between LCAT and TCNM. On this basis alone Plaintiffs' continuity argument fails because the "mere continuation

-6-
Case 18-01057-t    Doc 152    Filed 02/28/20    Entered 02/28/20 15:30:22 Page 6 of 9

exception has no application without proof of continuity of management and ownership between the predecessor and successor corporations." *Garcia*, 123 N.M. at 38.

Second, LCAT is still in existence. It is a named defendant in this proceeding, has retained counsel, and has participated throughout this proceeding. It is in good standing with the New Mexico Secretary of State Corporations Division.[4]

Finally, Plaintiffs do not argue, nor does any evidence show, that there was inadequate consideration for the sale. TCNM paid $965,000 for LCAT's business assets. It is undisputed that this was the fair market value of the assets.

Instead of attempting to satisfy the three elements of the "mere continuation" exception, Plaintiffs focused on TCNM's use of LCAT's trade name, telephone number, stationery, and physical address. Use of these assets does not raise a fact issue about "mere continuation." A key goal in most business sales is to capture the "goodwill" of the selling business. To achieve that goal, many buyers acquire the seller's trade name, telephone number, address, etc. *See, e.g., Value House v. Phillips Mercantile Co.*, 523 F.2d 424, 425 n.2 ("Generally speaking . . . a trade name [is applicable] to a business and its good-will."). Doing so does not indicate an improper continuation of the seller. *Welco Indus. v. Applied Cos.*, 617 N.E. 2d 1129, 1134 (Ohio 1993) (the basis of the mere continuation theory is "the continuation of the corporate entity, not the business operation, after the transaction"); *Myers v. Putzmeister, Inc.*, 596 N.E. 2d 754, 756-57 (Ill. App. 1992) (use of a successor's tradename, without evidence of common ownership between buyer and seller corporations, does not support successor liability). To hold the successor liable for the wrongful acts of its predecessor based on its use of the predecessor's trade name would "forc[e] the successor

---

[4]The Court takes judicial notice of the corporate standing records kept by this state government entity. *See Stone v. Whitman*, 324 F. App'x 726, 728 (10th Cir. 2009) ("court may take judicial notice of facts that are a matter of public record"); *United States v. Iverson*, 818 F.3d 1015, 1022 (10th Cir. 2016) (government websites are within the field of "public records" of which a court may take judicial notice).

to pay twice for goodwill[.]" *Semenetz v. Sherling & Walden, Inc.*, 851 N.E. 2d 1170, 1174 (N.Y. 2006). TCNM's use of LCAT's trade name, telephone number, and physical location does not raise a fact issue on the "mere continuation" exception to successor non-liability.

3. <u>There is no evidence TCNM engaged in a fraudulent transaction</u>. Finally, Plaintiffs argue that there are fact issues about whether TCNM's purchase of LCAT's assets was "entered into fraudulently in order to escape liability" for Plaintiffs' debts. The argument has no merit.[5]

New Mexico's appellate courts have not ruled on the "fraudulent transaction" exception to the general nonliability rule. The language of the exception makes clear, however, that it does not apply if the transaction was not undertaken by the seller to escape liability for valid obligations. Here, LCAT received fair market value for its assets. That fact belies any "fraudulent transaction" argument. *See, e.g., Welco Indus., Inc.*, 617 N.E. 2d at 1134 (in the context of successor-liability, "[i]ndicia of fraud include inadequate consideration and lack of good faith"); *Fletcher Cyclopedia of the Law of Corporations*, §7125, n.6 and accompanying text ("Where a corporation receives in good faith a transfer of assets of another corporation and pays full consideration, the transfer is not fraudulent").

If the Floyds and Ms. Romero wanted to escape liability for Plaintiffs' debts, they would not have converted LCAT's assets into cash at fair market value. The sale, far from removing assets from the reach of Plaintiffs and other creditors, made it easier for creditors to collect valid debts.

There is no evidence to support a "fraudulent transaction" argument and strong, undisputed evidence that no such fraudulent transaction occurred.

---

[5] In fact, at the February 24, 2020 hearing in this matter, Plaintiffs essentially conceded that they cannot prove that the fraud exception applies here. The Court addresses the argument nevertheless because Plaintiffs pursued it in their response to TCNM's motion for summary judgment.

III.    CONCLUSION

The general rule in New Mexico and throughout the country is that buyers of business assets are not liable for the seller's debts. There is no genuine issue of fact that none of the exceptions to this rule apply in this proceeding. TCNM's motion for summary judgment on this issue therefore will be granted by a separate judgment.

/s/ David T. Thuma

Hon. David T. Thuma
United States Bankruptcy Judge

Entered: February 28, 2020

Copies to: counsel of record.