UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

BRYAN A. LAMEY,                                                                                        Case No. 14-13729 ta7

      Debtor.

EDWARD MAZEL, Chapter 7 Trustee, and
UNITED REAL ESTATE LAS
CRUCES, LLC,

      Plaintiffs,

v.                                                                                             Adv. No. 18-01057-t

LAS CRUCES ABSTRACT AND TITLE
COMPANY, FIDELITY NATIONAL
TITLE INSURANCE COMPANY, and
TCNM, LLC,

      Defendants.

## **OPINION**

        The Court denied plaintiff United Real Estate Las Cruces, LLC's ("URELC's") motion for summary judgment on its breach of contract claim, instead opining that summary judgment in favor of defendant Fidelity National Title Insurance Company ("Fidelity") might be warranted. The Court solicited additional briefing on the issue. Now before the Court is Fidelity's motion for summary judgment on URELC's breach of contract claim.[1] The Court concludes that Fidelity's motion should be granted.

---

[1] The trustee's breach of contract claim has already been disposed of.

I.     UNDISPUTED MATERIAL FACTS

The Court incorporates by reference its Omnibus Findings of Fact for All Pending Motions for Summary Judgment, filed March 20, 2020, doc. 159. Capitalized and abbreviated terms not otherwise defined are taken from the Omnibus Findings.

URELC's claim is based on the fact that the KZRV Mortgage—an encumbrance on the Property URELC bought—was disclosed in a title commitment Fidelity issued, was not released at closing, but was not listed as a title exception in the Owner's Policy. The facts surrounding the non-release of the KZRV Mortgage are well known to the parties.

The Owner's Policy is a standard form, conforming to New Mexico law. *See* NMSA § 59A-30-5; NM Code R. § 13.14.18.13; NM Form 1. It is quite similar to the standard title insurance policy form used throughout the United States.

In July 2015, URELC made a claim under the Owner's Policy, alleging Fidelity's "fail[ure] to find and/or disclose to URELC that the property URELC was financing through LANB had a mortgage on it by KZRV." Fidelity denied the claim:

> While your letter . . . claims that URELC was not aware of the KZRV Mortgage prior to its purchase of the Property, the KZRV Mortgage was disclosed . . . in . . . the Commitment for Title Insurance issued to URELC effective August 30, 2012[.] . . . Further, Robert Maese Sr., a member of URELC, not only knew about the KZRV Mortgage, but also agreed to obtain the release of the KZRV Mortgage; his failure to do so directly caused the KZRV Mortgage to remain of record. Because URELC had knowledge of the KZRV Mortgage and Robert Maese Sr., whose conduct is imputable to URELC as a member of URELC, agreed to obtain a release of the KZRV Mortgage and failed to do so, Exclusion 3(a) excludes the KZRV Mortgage from coverage under URELC's Owner Policy.[2]

---

[2] Exclusion 3(a) precludes coverage for "Defects, liens, encumbrances, adverse claims or other matters . . . created, suffered, assumed or agreed to by the Insured Claimant." Exclusion 3(a), upon which Fidelity based its denial of URELC's claim for coverage, is a standard clause in uniform title insurance contracts.

In August 2016, Lamey asked Fidelity to reconsider the denial, arguing that Maese Sr. did not represent URELC in the transaction and that Lamey, URELC's only manager, was not aware of the KZRV Mortgage. Fidelity rejected the reconsideration request:

> Maese, Sr. was a member of URELC at the time the Property was purchased, knew of the existence of the KZRV Mortgage and its unreleased status, and represented he would obtain its release after the purchase of the Property but failed to do so. As an active member of URELC at the time of the purchase, Maese Sr.'s knowledge of the foregoing matters is imputed to URELC. Neither Maese, Sr.'s alleged lack of authority to transact URELC's business or your alleged lack of knowledge of the KZRV Mortgage (despite its being disclosed on the Commitment) negate this imputation. Because URELC is imputed with knowledge of the unreleased KZRV Mortgage at the time of the transaction, [Fidelity] affirms its prior denial of coverage under Exclusion 3(a).

URELC asserts that Fidelity's denial of coverage breached the Owner's Policy and claims damages due to

> Fidelity's . . . failure to act diligently to remove the KZRV Mortgage clouding the title. Although Fidelity ultimately settled the KZRV litigation with LANB, it took roughly eighteen months to do, while in the meantime it subjected its other insured to foreclosure, and loss of the equity in the building, and liability for costs, fees, and interest associated with the foreclosure. . . . During this time, URELC was effectively precluded from selling, leasing, or utilizing this asset. The sum of the lost equity in the amount of $223,580.58 and the deficiency judgment of $448,919.42 plus interest at 16% per annum represent, in part, the economic damages suffered by Plaintiffs as a result of Fidelity's failure to provide URELC coverage under the Owner's Policy.

The damages URELC claims do not include attorney fees for defending the KZRV foreclosure action, and URELC has no fee bills that would support a claim for attorney fees.

## II.   DISCUSSION

A.   <u>Summary Judgment Standards</u>.

Summary judgment is appropriate where "there is no genuine dispute as to any material fact" thereby entitling the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A dispute is genuine when the evidence is such that a reasonable jury could return a verdict for the

nonmoving party," and a fact is material when it "might affect the outcome of the suit under the governing substantive law." *Bird v. West Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986)). In ruling on a motion for summary judgment, the Court is required to "view the facts and draw reasonable inferences in the light most favorable to the party opposing the . . . motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. However, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50.

B.      <u>Fidelity Properly Denied URELC's Claim</u>.

1.      <u>There is No Genuine Dispute that Maese Sr. Was URELC's Agent</u>. A key question is whether Maese Sr. was URELC's agent in its dealings with Fidelity (and *its* agent LCAT). If Maese Sr. was, then his knowledge of the KZRV Mortgage is imputed to URELC and his actions relating to the mortgage bound URELC. The imputed knowledge and binding actions would mean that Fidelity was within its rights to deny URELC's claim because it was based on a lien "suffered, assumed or agreed to by the Insured Claimant."

The following facts in the record support a finding that Maese Sr. was URELC's agent in the loan and purchase transaction at issue:

- Before URELC was formed, Lamey, Maese Sr. and Maese Jr. were all involved in negotiating with American RV World's creditors, trying to obtain discounted payoffs or otherwise restructure the business;
- Each brought a strength to the contemplated new enterprise: Maese Sr. had 35 years of experience in the RV business; Maese Jr. also had significant experienced in the RV business and was an excellent salesman; and Lamey had money and also had expertise in accounting and business finance;

- Lamey and the Maeses worked together to create the restructured RV businesses they envisioned;
- Lamey (51%), Maese Sr. (24.5%), and Maese Jr. (24.5%) were the only members of UREH, which wholly owned URELC;
- Lamey's plan was to appoint Maese Jr. president of the Albuquerque and Las Cruces operating entities, despite the fact that the operating agreement said that only Lamey had authority to act for the entities;
- Maese Sr. had the relationship with LANB;
- While Maese Sr. had many years of experience in the RV business, Lamey had no experience;
- Lamey admits that Maese Sr. (and perhaps Maese Jr.) negotiated the loan terms with LANB;
- When LANB sent LCAT a title commitment order form, it specified that Maese Sr. was the designated contact for URELC;
- Maese Sr. guaranteed the LANB loan;
- LCAT never talked to Lamey or Maese Jr.;
- Lamey, Maese Sr. and his wife, and Maese Jr. and his wife all attended the closing in Albuquerque. There is no evidence that Lamey was surprised by the settlement statement, the closing documents, or any other aspect of the closing;
- Lamey knew LCAT had dealt with somebody acting on URELC's behalf, and he knew it wasn't him;
- The mortgage payoff figures in the closing statement (prepared by LCAT) must have come from Maese Sr; and Maese Sr., rather than Lamey, worked on getting the Owners Policy for URELC; and
- After the closing the Maeses and Lamey continued to work together for a period of time to try and save the RV businesses. For example, the decision to close the Albuquerque location was a joint decision.

Because all the evidence in the record points to Maese Sr.'s agency, the Court asked URELC to provide any evidence it had that Maese Sr. was *not* URELC's agent. URELC did not provide any such evidence. Instead, it continues to rely on its operating agreement, which states that only Lamey has authority to bind URELC. As previously held, this is not enough to prevent Maese Sr. from being URELC's agent. Rather, agency may be evidenced by a writing, *see* Fletcher Cyclopedia of the Law of Corporations, § 437.20; by the spoken words or conduct of the principal, *see Unlimited Equip. Lines, Inc. v. Graphic Arts Centre, Inc.*, 889 S.W.2d 926, 936 (Mo. App. 1994); or "inferred from attending circumstances," *see Romero v. Mervyn's*, 784 P.2d 992, 997 (N.M. 1989); *State Fin. Co. v. Hershel Cal. Fruit Prods. Co.*, 47 P.2d 821, 823 (Cal. App. 1935)

("The extent of an agent's authority, and the ratification of an unauthorized act, may be proved by circumstantial evidence"); *Bayless v. Christie, Manson & Woods Intern., Inc.*, 2 F.3d 347, 352 n. 6 (10th Cir. 1993) ("an agency relationship arises, regardless of the parties' intent, when two parties agree that one is to act for another, or the conduct of the parties is such that it demonstrates [that] one [is] to act for the other"). "There is no particular mode by which an agency must be established[.]" *Kennedy v. Justus*, 64 N.M. 131, 134 (S. Ct. 1958). "The existence of an agency relationship based on actual authority can arise by express authorization or by implied authorization." *Bayless*, 2 F.3d at 352 n.6.

Given the lack of contrary evidence, the only plausible inference from the undisputed material facts is that Maese Sr. had actual or tacit authority to act for URELC in the transaction. No reasonable jury could conclude otherwise.

2. <u>URELC's Knowledge of the KZRV Mortgage</u>. Maese Sr. knew all about the KZRV Mortgage, having signed it in May 2011. As URELC's agent, Maese Sr.'s knowledge of the mortgage is imputed to URELC. *See CompoSecure, L.L.C. v. CarUX, LLC*, 206 A.3d 807, 823 (Del. 2018) (knowledge of an agent acting within the scope of her authority on behalf of the principal LLC is imputed to the LLC); *D.R.A. Services, LLC v. Hallmark Ins. Co.*, 2014 WL 12629943, at *3 (D. Wyo.) ("A limited liability company is charged with the knowledge of its agents received while acting within the scope of their authority"); *In re Sandburg Mall Realty Mgmt. LLC*, 563 B.R. 875, 888 (Bankr. C.D. Ill. 2017) (in general, by analogy to partnership law, notice to or knowledge of a member is imputed to the LLC); *see generally Sawyer v. Mid-Continent Petroleum Corp.*, 236 F.2d 518, 520 (10th Cir. 1956) (a corporation "is necessarily chargeable with the composite knowledge of its officers and agent, acting within the scope of their authority"); Fletcher Cyclopedia of Corporations, § 807 ("knowledge of agents who are not

officers may be imputed to the corporation."); *Collegium Fund LLC Series 16 v. Deutsche Bank Nat'l Trust Co.*, 443 P.3d 550, at *1 (Nev.) (agent's knowledge is imputed to the principal); 3 Am. Jur. 2d *Agency* § 255 (2018) ("generally, the principal is chargeable with, and bound by, the knowledge of or notice to an agent").

In addition to Maese Sr.'s actual knowledge of the KZRV Mortgage, URELC had constructive knowledge of the mortgage. *See, e.g., In re Lamey*, 2017 WL 1839154, *3 (Bankr. D. N.M.); *Angle v. Slayton*, 102 N.M. 521, 523 (S. Ct. 1985) ("purchasers are deemed to have constructive notice of duly recorded instruments concerning the property"); *Allen v. Timberlake Ranch Landowners Ass'n*, 138 N.M. 318, 327 (Ct. App. 2005) (citing and following *Angle*); *Atkinson v. Atkinson (In re Atkinson)*, 126 B.R. 713, 717 (Bankr. N.D. Tex. 1991) (same). URELC, a buyer of New Mexico real property, was charged under New Mexico law with knowledge of all recorded instruments relating to the Property, including the KZRV Mortgage. The law does not permit buyers to profess ignorance of recorded mortgages. URELC's claim that it was unaware of the KZRV Mortgage is unsupportable.

3. <u>URELC Knew the KZRV Mortgage Would Not be Released</u>. Not only did Maese Sr. know about the KZRV Mortgage, he knew it was not going to be released at closing. This knowledge also is imputed to URELC. Furthermore, the HUD-1 Settlement Statement URELC signed at closing showed no disbursement to KZRV. The undisputed facts show that URELC knew the KZRV Mortgage would not be released at closing.[3]

4. <u>Maese Sr.'s Actions Bound URELC</u>. Romero testified that Maese Sr. assured her he would get the KZRV Mortgage released. On Thursday, August 30, 2012, Romero's assistant

---

[3] For a discussion of URELC's argument that Maese Sr. did not know about the failure to release the KZRV Mortgage, see footnote 4, infra.

sent a proposed KZRV Mortgage release to Georgia Torrez at LANB, asking "Can you please forward the attachment to Mr. Maese at Next Level, LLC? Thanks." Ms. Torrez forwarded the release to Maese Sr. a minute later, saying "this needs to be signed as well." Four hours later Maese Sr. forwarded the release to Delbert Miller at KZRV, saying "DELBERT please sign and next day air to los alamos bank friday also please notary stamp it THANKS ROBERT SR." Finally, Mr. Miller responded within the hour to Maese Sr.: "Robert, Got your message, is the closing Tuesday?"

The email chain is conclusive evidence that, pre-closing, LCAT looked to Maese Sr. to obtain a release of the KZRV Mortgage, and that he attempted to do so. Obviously, his attempt failed. The closing proceeded anyway, based on Maese Sr.'s representation to Romero that he would get the release.[4]

A principal is bound by its agent's actions. *See Barron v. Evangelical Lutheran Good Samaritan Soc.*, 265 P.3d 720, 725 (N.M. App. 2011) (the principal "is bound by the acts of [an] agent within the agent's actual designated authority" as well as "acts of the agent that the principal holds the agent out to the public as possessing"); *San Juan Agric. Water Users Ass'n v. KNME-TV*, 257 P.3d 884, 889 (N.M. 2011) ("the common law of agency regards the agent's actions as

---

[4] Relying on certain testimony of Maese Sr., URELC disputes that LCAT asked Maese Sr., pre-closing, to get a release of the KZRV Mortgage. Maese Sr. testified in his deposition that he did not send a release of mortgage to Delbert Miller on August 30, 2012. Maese Sr. claimed instead that he sent some kind of inventory release form to Mr. Miller. Maese Sr. also testified, in his deposition and later at trial, that the first time LCAT asked him to obtain a KZRV Mortgage release was three or four months after closing. Maese Sr.'s testimony is obviously false, given the email chain (which Maese Sr. did not dispute) and the attached release. Delbert Miller's deposition testimony confirmed that Maese Sr. sent him a draft release of mortgage on August 30, 2012, with the email chain. False statements cannot be used to create a genuine fact issue. *See Rivera v. Trujillo*, 128 N.M. 106, 108 (Ct. App. 1999) ("a nonmovant will not be allowed to defeat summary judgment by attempting to create a sham issue of fact"); *Frank v. O'Friel*, 2013 WL 6662723, at *3 (N.M. App. 2013) (following *Rivera*). Using false testimony to try to create a fact issue is not an admirable litigation technique.

the principal's own"); *Wirth v. Sun Healthcare Group, Inc.*, 389 P.3d 295, 306 (N.M. App. 2016) ("[A]ny act or omission of an officer or employee of a corporation within the scope or course of his or her employment, is an act or omission of the corporation."). Here, the only genuine evidence is that URELC, acting through its agent Maese Sr., represented to LCAT that it would obtain the KZRV Mortgage release.

     5.    <u>URELC Suffered the KZRV Mortgage</u>. In *Home Federal Savings Bank v. Ticor Title Insurance Company*, 695 F.3d 725 (7th Cir. 2012), the Seventh Circuit stated:

> The cases discussing the applicability of the 'created or suffered' exclusion generally have stated that the insurer can escape liability only if it is established that the defect, lien or encumbrance resulted from some intentional misconduct or inequitable dealings by the insured *or the insured either expressly or impliedly assumed or agreed to the defects or encumbrances in the course of purchasing the property involved*. The courts have not permitted the insurer to avoid liability if the insured was innocent of any conduct causing the loss or was simply negligent in bringing about the loss.

*Id.* at 732-33 (italics added), quoting *Brown v. St. Paul Title Ins. Corp.*, 634 F.2d 1103, 1107 n.8. (8th Cir. 1980). An insured "suffers" a title encumbrance when it knows of the encumbrance but chooses to close the transaction without eliminating it. *Ariz. Title Ins. & Trust Co. v. Smith*, 519 P.2d 860, 863 (Ariz. App. 1974) ("suffered" implies a circumstance in which the insured knows of the lien and could insist on its elimination but chooses not to); J. Bushnell Nielsen, Title & Escrow Claims Guide, § 11.2 ("[a]n insured may also 'suffer' a title defect by electing to close on the transaction knowing that the matter very likely attaches or will attach to the property"); *Am. Sav. & Loan Ass'n v. Lawyers Title Ins. Corp.*, 793 F.2d 780, 784 (6th Cir. 1986) (the term "suffered" is synonymous with "permit" and it implies knowledge of the encumbrance and the power to prevent the title insurance claim from arising). Similarly, an insured "agrees to" or "assumes" an encumbrance when the it knows about an existing encumbrance and purchases the property anyway. *First. Am. Title Ins. Co. v. Lane Powell PC*, 764 F.3d 114, 122 (1st Cir. 2014)

("An insured party 'assumes' or 'agrees' to a lien pursuant to [the exclusion] when it takes property that is subject to an existing encumbrance it has knowledge of.").

URELC, by closing the loan and purchase transaction knowing of the KZRV Mortgage and that it would continue to encumber the Property after closing, suffered, agreed to, and/or assumed the mortgage. Fidelity is entitled to summary judgment that its denial of URELC's claim did not breach the Owner's Policy.

C.     <u>URELC's Breach of Contract Claim Fails Because It Incurred No Recoverable Damages</u>.

Even if Fidelity breached the Owner's Policy when it denied URELC's claim, URELC's claim for breach of contract fails because it incurred no compensable damages. An essential element of a cause of action for breach of contract is actual damage. *See, e.g., Camino Real Mobile Home Park Partnership v. Wolfe*, 119 N.M. 436, 444-45 (S. Ct. 1995), overruled on other grounds by *Sunnyland Farms, Inc. v. Central New Mexico Elec. Co-op, Inc.*, 301 P.3d 387 (S. Ct. 2013); *Stevens v. Mitchell*, 51 N.M. 411, 414 (S. Ct. 1947) (damages is an essential element of a breach of contract claim).

The Owner's Policy entitles URELC to recover certain losses if it has a valid claim. The relevant portions of the policy are:

> 5. DEFENSE AND PROSECUTION OF ACTIONS. (a) Upon written request by the Insured, and subject to the options contained in Section 7 of these Conditions, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured.
>
> 7. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY. In case of a claim under this policy, the Company shall have the following additional options: . . . (b) To Pay or Otherwise Settle With Parties Other than the Insured or With the Insured Claimant. (i) To pay or otherwise settle with other parties for or in the name of an Insured Claimant any claim insured against under this policy. . . . Upon the exercise by the Company of either of the options provided for in subsection (b)(i) or (ii), the Company's obligations to the Insured under this policy for the claimed loss or damage, other than the payments required

to be made, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

8. DETERMINATION AND EXTENT OF LIABILITY. This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy. (a) The extent of liability of the Company for loss and damage under this policy shall not exceed the lesser of (I) the Amount of Insurance; or (II) the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy. . . . (c) In addition to the extent of liability under (a) and (b), the Company will also pay those costs, attorneys' fees, and expenses incurred in accordance with Section 5 and 7 of these Conditions.

9. LIMITATION OF LIABILITY. (a) If the Company establishes the Title, or removes the alleged defect, lien or encumbrance . . . in a reasonably diligent manner by any method including litigation and the completion of any appeals, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused to the insured.

Fidelity paid KZRV $391,492.45 and got the KZRV Mortgage released. Thus, although Fidelity denied URELC's claim, URELC realized the main benefit of the Owner's Policy—the KZRV Mortgage was released at no cost to URELC. The only other compensable damages URELC might claim are attorney fees incurred in the KZRV foreclosure action (paragraph 8(c)), and/or damages caused by Fidelity's failure to proceed in a "reasonably diligent manner" (paragraph 9(a)).

    1.    <u>Attorney Fees</u>. URELC is not claiming attorney fees as part of its breach of contract damages and has no billing documents to support such a claim. There is no genuine issue of fact that URELC has no contract damage claim for attorney fees.

    2.    <u>Loss of Equity and Deficiency Judgment</u>. URELC claims damages for loss of equity in the Property ($223,580.58) and the amount of LANB's deficiency judgment ($448,919.42 plus 16% interest), both allegedly incurred because of Fidelity's "failure to act diligently to remove the KZRV Mortgage." Assuming Fidelity was dilatory (which the Court by

no means finds), URELC has provided no evidence that the delay caused the alleged loss of "equity" in the Property or the deficiency judgment debt. Rather, it is undisputed that LANB foreclosed its mortgage because URELC stopped paying LANB's loan, and that URELC stopped paying the loan because it went out of business due to a lack of capital and operating losses. Neither Fidelity nor the KZRV Mortgage had anything to do with URELC's business failure or payment default, nor with LANB's response to the payment default.

If URELC wanted to avoid summary judgment on this issue, it was required to provide some evidence that Fidelity's alleged delay in getting the KZRV Mortgage released proximately caused damages recoverable under the Owner's Policy. No such evidence was provided.[5] On the other hand, the evidence that URELC's severe financial problems had nothing to do with Fidelity is clear, substantial, and uncontradicted. Fidelity is entitled to summary judgment on URELC's breach of contract claim because there is no genuine fact issue that Fidelity's denial of the claim, even if improper, caused no damages compensable under the Owner's Policy.

### III. CONCLUSION

Fidelity's motion for partial summary judgment on the breach of contract claim is well taken and will be granted. A separate order will be entered herewith.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: July 17, 2020
Copies to: Counsel of record.

---

[5] It is hard to view URELC's weak attempt to blame Fidelity for its financial troubles as being made in good faith.